IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

'13 JUN -3 P 12: 11

MICHAEL BIXLER,                    *

      Plaintiff,              *

                            *

         v.                    *        CIVIL NO.: WDQ-12-1650

                            *

SEAN HARRIS, *et al.*,              *

      Defendants.             *

   *     *     *     *     *     *     *     *     *     *     *     *     *

MEMORANDUM OPINION

Michael Bixler sued various Maryland State police officers[1] (collectively, the "Defendants") for civil rights violations and Maryland state law claims. For the following reasons, the Defendants' motion to dismiss or for summary judgment, construed as a motion for summary judgment,[2] will be granted in part, and denied in part.

---

[1] The named Defendants are Maryland State Police ("MSP") Trooper First Class ("TFC") Sean Harris, MSP TFC Walter Rasinski, MSP Sergeant Brooke Tognocchi, and Maryland Natural Resources Police ("MNRP") Corporal Timothy Grove. Compl. Bixler also sued John Does 1-99 (unknown police officers "who participated in the acts of the [D]efendants"). *Id.* ¶ 7.

[2] *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

## I. Background[3]

This case arises out of a June 13, 2009 traffic stop in Harford County, Maryland, of which the parties offer dramatically different accounts. Bixler alleges that, while he was handcuffed, surrounded, and posing no threat, he was "severely beaten" by one or more of the Defendants. ECF No. 10-1 at 1. The Defendants contend that Bixler was intoxicated and resisted arrest, jeopardized the officers' safety, and required an appropriate use of force to restrain him. ECF No. 9-1 at 7.

### A. The Pursuit

On June 13, 2009, Harris, Rasinski, and Tognocchi (the "MSP officers") were conducting speed enforcement on Route 136 from the parking lot of Dublin Elementary School in Harford County, Maryland. Harris Decl. ¶ 2; Rasinski Decl. ¶ 2; Tognocchi Decl. ¶ 2. At about 5:35 p.m., a motorcyclist--later determined to be Bixler--approached the officers at a rate of 72 mph, more than 40 mph above the posted speed limit in the school safety zone. Harris Decl. ¶¶ 3, 5; *see* Rasinski Decl. ¶¶ 3, 5; Tognocchi Decl. ¶¶ 3, 5. Harris stepped into the travel portion of northbound Route 136 to flag the motorcyclist down. Harris Decl. ¶ 4; Rasinski Decl. ¶ 4; Tognocchi Decl. ¶ 4. Bixler

---

[3] In reviewing a motion for summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

slowed to about 15 mph when he was about 50 feet away, but then "abruptly" increased speed. Harris Decl. ¶ 5; *see* Rasinski Decl. ¶ 5; Tognocchi Decl. ¶ 5.[4] Harris moved out of the way to avoid being hit, but was able to see Bixler's face, helmet, and clothing so that he could later make a positive identification. Harris Decl. ¶ 6; *see* Rasinski Decl. ¶ 6; Tognocchi Decl. ¶ 6.[5] Bixler continued driving northbound on Route 136. Harris Decl. ¶ 8; Rasinski Decl. ¶ 8; Tognocchi Decl. ¶ 8.

The MSP officers chased Bixler, but lost sight of him. *See* Harris Decl. ¶ 8; Rasinski Decl. ¶ 8; Tognocchi Decl. ¶ 8. They discovered Bixler's abandoned motorcycle in the Harford Christian School parking lot north of Route 440 on Route 136. Harris Decl. ¶ 9; Rasinski Decl. ¶ 9; Tognocchi Decl. ¶ 9.[6] Tognocchi, the K-9 handler on duty, used trained tracking dog Kato to locate Bixler. Harris Decl. ¶ 10; Rasinski Decl. ¶ 10; Tognocchi Decl. ¶ 10. Kato led the officers into the wooded

---

[4] Bixler admits that he did not obey Harris's directive to pull over, but asserts that he accelerated because he heard "a noise like a gunshot" "close behind" him and was "afraid for [his] life." Bixler Decl. ¶ 3. Harris, Rasinski, and Tognocchi deny having discharged their firearms or having heard "anything" that sounded like a gunshot. Harris Decl. ¶ 7; Rasinski Decl. ¶ 7; Tognocchi Decl. ¶ 7.

[5] Bixler was wearing an open face helmet. Harris Decl. ¶ 6; Rasinski Decl. ¶ 6; Tognocchi Decl. ¶ 6.

[6] Bixler states that he "hid" in the woods after abandoning the motorcycle, and called his father for help. Bixler Decl. ¶ 4.

area behind the school, where they found Bixler's helmet. Harris Decl. ¶ 10; Rasinski Decl. ¶ 10; Tognocchi Decl. ¶ 10.

While the MSP officers were following Kato into the woods, Grove overheard radio traffic about the chase and offered his help. Harris Decl. ¶ 11; Grove Decl. ¶ 2. Grove drove to Scarboro Road, at the wooded area where the MSP officers were. Harris Decl. ¶ 11; Grove Decl. ¶ 3. Upon arriving, Grove observed a motorcycle being driven slowly toward him. Grove Decl. ¶ 4.[7] Grove watched as Bixler left the field near the road and jumped onto the motorcycle. *Id.* ¶¶ 4-5; Harris Decl. ¶ 13. Grove turned on his emergency lights and pulled in front of the motorcycle, which stopped. Grove Decl. ¶ 4. Grove told the driver (Bixler's father),[8] to turn off the engine, and asked Bixler to dismount. *Id.* ¶ 5.[9] By radio, Grove told the MSP officers that he had caught someone leaving the woods, whose description matched their suspect. *Id.*; Harris Decl. ¶ 12; Rasinski Decl. ¶ 11; Tognocchi Decl. ¶ 12. While waiting for the MSP officers to arrive, Grove handcuffed Bixler. Grove Decl. ¶ 5; Bixler Decl. ¶ 6. Bixler did not resist. Bixler Decl. ¶ 6.

---

[7] The motorcycle was traveling so slowly that it was "weaving within its lane" to remain upright. Grove Decl. ¶ 4.

[8] *See* Bixler Decl. ¶ 5.

[9] Bixler's father was later released and left "without protest." Bixler Decl. ¶ 13; Harris Decl. ¶ 13.

Harris immediately went to Scarboro Road; Tognocchi stayed behind to allow Kato to rest. Harris Decl. ¶ 13; Tognocchi Decl. ¶ 14. Rasinski brought Tognocchi's car to him, then left to join Harris. Rasinski Decl. ¶ 12; Tognocchi Decl. ¶ 14. Tognocchi drove to Scarboro Road, but says that he stayed about one tenth of a mile away from the scene because he wanted to let Kato out of the car and "[o]nce a subject is in custody, it is not appropriate to let the K-9 out near the subject because of the potential for accidental injury." Tognocchi Decl. ¶ 15. Tognocchi "was not able to see or hear" what Harris and Rasinski were doing. *Id.*[10] Tognocchi returned to the Harford Christian School parking lot to wait for Bixler's motorcycle to be towed. *Id.* ¶ 16.

B. The Arrest

According to the Defendants, Harris was the first trooper to arrive at Scarboro Road; he identified Bixler as the fleeing motorcyclist. Harris Decl. ¶¶ 5, 13; Grove Decl. ¶ 6.[11] When Harris approached Bixler, he "immediately detected" an "overwhelming" smell of alcohol on Bixler's breath and person.

---

[10] The MSP Criminal Investigation Report lists Tognocchi as a "witness" to the crime of resisting arrest, with which Bixler was later charged. ECF No. 10-3 at 2.

[11] Bixler states that Harris arrived with "another Maryland State Police Officer." Bixler Decl. ¶ 7.

Harris Decl. ¶ 14.[12]  Harris also noticed "a number of" small

abrasions on Bixler's face, arms, and legs, which Harris

believes he acquired while running through the woods.  *Id.*

Harris handcuffed Bixler, removed Grove's handcuffs, and

performed a "brief" pat down of Bixler.  *Id.*[13]  Bixler "could

tell by the expression on [Harris's] face that he was very

angry;" Bixler was afraid.  Bixler Decl. ¶ 8.  Harris then

escorted Bixler to the rear of his car, where he performed a

more thorough search "incident to arrest."  Harris Decl. ¶ 16;

*see* Bixler Decl. ¶¶ 10-11.[14]  The search did not yield weapons or

contraband.  Harris Decl. ¶ 16; Bixler Decl. ¶ 14.  According to

Bixler, he asked Harris to adjust the handcuffs because they

were "painfully tight."  Bixler Decl. ¶ 12.  Harris did not

respond.  *Id.*

What happened next is disputed.  The parties' respective

accounts are provided in sequence.

---

[12] Bixler does not directly challenge Harris's statement that he
smelled like alcohol, but insists that he "was not drunk."
Bixler Decl. ¶ 7.

[13] According to the Defendants, Grove left the scene after his
handcuffs were returned, and Rasinski arrived as Grove was
leaving.  Harris Decl. ¶ 15; *see* Rasinski Decl. ¶ 13; Grove
Decl. ¶ 6.  Bixler states that Grove was present during his
alleged beating.  *See* Bixler Decl. ¶ 24.  The MSP Criminal
Investigation Report lists Grove as a "witness" to Bixler's
resisting arrest.  ECF No. 10-3 at 2.

[14] The Defendants do not indicate whether and when Bixler was
told that he was under arrest.  *See generally* Harris Decl.;
Rasinski Decl.; Tognocchi Decl.

1. Bixler's Account

According to Bixler, after he was searched, Harris grabbed
his sunglasses, broke them in half, and threw them to the
ground. Bixler Decl. ¶ 15. Harris "looked very angry," and
Bixler was afraid. *Id.* Bixler "did not resist, attempt to
struggle, or flee." *Id.* ¶ 16. Bixler's cell phone began to
ring; Harris removed the phone from Bixler's pocket, broke it,
and threw it to the ground. *Id.* ¶¶ 17-18. Harris also "went
through" Bixler's pockets and ripped his pants. *Id.* ¶ 18.
Bixler started to "wriggle" his hands for relief from the pain
caused by the handcuffs. *Id.* ¶ 19. Harris accused Bixler of
trying to escape, and ordered him to stop moving his hands;
Bixler complied. *Id.* ¶¶ 19-20. Harris next ordered Bixler to
place his head on the trunk of the car. *Id.* ¶ 21. After Bixler
complied, he was "viciously punched four times in the face."
*Id.* ¶ 22. Bixler did not see which officer hit him, but is
"sure" that Harris was one of them, based on Harris's "anger and
the fact that he kept telling me at that time to stop
resisting." *Id.* During the beating, the "other police
officers" "positioned" themselves so that Bixler could not
protect himself. *Id.* ¶ 23.[15]

---

[15] Bixler does not indicate how many officers were present then,
and he does not describe the officers' appearances. *See
generally* Bixler Decl.

While Bixler was "lying on the trunk in a daze and in a lot of pain," he overheard Grove say that he was leaving. Bixler Decl. ¶ 24. Bixler was then "viciously jerked up" from the trunk by the handcuffs, causing him to "cry out in great pain." *Id.* Bixler was then "thrown" into a nearby ditch. *Id.* ¶ 25. As he lay on the ground, Harris warned him to "Get the fuck up or I'm gonna taze [sic] you!" *Id.* Bixler told Harris he could not stand because he was "so beat up." *Id.* Harris and "the [MSP] Officer who arrived shortly after him" again "viciously jerked" Bixler up by his handcuffs. *Id.* Bixler began to cry from the pain. *Id.* Bixler was placed in Harris's car and taken to MSP barracks. *Id.* ¶ 26. After he was released the next day, he went to Memorial Hospital to seek treatment for, among other injuries, contusions on his left eye, abrasions on his wrists, swelling and bruising on the left side of his face, facial pain, head pain, and numbness in both hands. *Id.* Bixler sought follow-up treatment and was diagnosed with damage to his left ulnar nerve. *Id.* Bixler continues to suffer from numbness and pain in his left hand. *Id.*

2. The Defendants' Account

According to the Defendants, when the search was completed, Harris "placed" Bixler in the front passenger seat of his patrol car. Harris Decl. ¶ 17; Rasinski Decl. ¶ 14. While Bixler was in the car, Harris observed Bixler attempting to bring his

8

handcuffs to the front of his body by moving them under his legs. Harris Decl. ¶ 17; *see* Rasinski Decl. ¶ 14. Bixler's hands became stuck behind his thighs, and he complained of pain. Harris Decl. ¶¶ 17-18; Rasinski Decl. ¶ 14. Harris removed Bixler from the car. Harris Decl. ¶ 19; Rasinski Decl. ¶ 15. Bixler, "who was extremely intoxicated and still off-balance from his handcuffs being around his hamstrings," fell into a grassy ditch. Harris Decl. ¶ 19; *see* Rasinski Decl. ¶ 15.

After determining that Bixler's hands could not be repositioned without removing at least one of the handcuffs, Harris removed the handcuff from Bixler's left arm. Harris Decl. ¶¶ 20-21. Bixler resisted Harris's efforts to replace the handcuff. Harris Decl. ¶ 21; Rasinski Decl. ¶ 16. Harris ordered Bixler to stop resisting, and tried to muscle Bixler's hands into position, but was unable to reattach the handcuff even with Rasinski holding Bixler's right arm. Harris Decl. ¶ 21; Rasinski Decl. ¶ 16. Concerned that the handcuff on Bixler's right arm could be used as a weapon, Harris Decl. ¶ 21, Harris attempted to use a palm strike on Bixler's neck but, because of his position, instead delivered "two or three" open palm strikes to the left side of Bixler's face, *id.* ¶ 22. Rasinski--who was "focusing on holding [Bixler's] arm"--"did not observe" Harris's "exact actions." Rasinski Decl. ¶ 16. Bixler

stopped resisting and Harris re-secured the handcuffs. Harris
Decl. ¶ 22; *see* Rasinski Decl. ¶ 16.

Tognocchi offered Bixler medical assistance at MSP
barracks, but Bixler refused. *Id.*; Tognocchi Decl. ¶ 19.
Tognocchi handed Bixler a frozen water bottle, which he
accepted. Tognocchi Decl. ¶ 19.

## C. The State Prosecution

Following the incident, Bixler was charged with resisting
arrest and 10 different traffic offenses in *State v. Bixler*, No.
12-K-09-001571 (Cir. Ct. for Harford Cnty., filed Sept. 16,
2009). *See* ECF No. 9-6 at 4-5.[16]  On March 11, 2010, Bixler pled
guilty to eluding and escaping from uniformed police officers,
in violation of Md. Code Ann., Transp. § 21-904(b). *Id.* at 5.
Bixler was sentenced to 12 months imprisonment, 11 of which were
suspended. *Id.*

## D. Procedural History

On June 5, 2012, Bixler filed suit. ECF No. 1.[17]  On August
30, 2012, the Defendants moved to dismiss or, alternatively, for

---

[16] The traffic violations included exceeding the posted speed
limit within a school zone, and negligent and reckless driving.
ECF No. 9-6 at 4-5.

[17] The complaint alleged five causes of action:
(1) Excessive force under 42 U.S.C. § 1983 (Count One);
(2) Assault (Count Two);
(3) Battery (Count Three);
(4) Excessive force under Maryland Declaration of Rights Article
24 (Count Four); and

summary judgment.  ECF No. 9.  On November 20, 2012, Bixler

opposed the motion.  ECF No. 10.  On December 19, 2012, the

Defendants replied.  ECF No. 13.

II. Analysis

  A. Legal Standard

    Under Rule 56(a), summary judgment "shall [be] grant[ed] .

. . . if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).[18]  In considering the

motion, "the judge's function is not . . . to weigh the evidence

and determine the truth of the matter but to determine whether

there is a genuine issue for trial."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249 (1986).  A dispute about a material fact

is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Id.* at 248.

    The Court must "view the evidence in the light most

favorable to . . . the nonmovant, and draw all reasonable

inferences in [his] favor," *Dennis v. Columbia Colleton Med.*

---

(5) Excessive force under Maryland Declaration of Rights Article
    26 (Count Five).
ECF No. 1 at 9-12.  Bixler sought $1 million in actual and
compensatory damages, $3 million in punitive damages, and
attorney's fees and costs.  *Id.* at 12.

[18] Rule 56(a), which "carries forward the summary-judgment stan-
dard expressed in former subdivision (c)," changed "genuine
'issue' [to] genuine 'dispute,'" and restored the word "'shall'
. . . to express the direction to grant summary judgment."  Fed.
R. Civ. P. 56 advisory committee's note.

*Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted). A party opposing summary judgment "may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 525.

Generally, "a district court must refuse summary judgment wh[en] the nonmoving party has not had the opportunity to discover information that is essential to [his] opposition." *Nader v. Blair,* 549 F.3d 953, 961 (4th Cir. 2008) (internal quotation marks and citation omitted). In such a case, the nonmoving party must comply with Fed. R. Civ. P. 56(d) and "set out the reasons for discovery in an affidavit." *Id.* "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protections of Rule 56[d] in good faith and to afford the trial court the showing necessary to assess the merits of a party's opposition." *Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 244 (4th Cir. 2002). Sufficient time for discovery is "considered especially important when the relevant facts are exclusively in the control of the opposing party." *Id.* at 246-47 (internal quotation marks omitted).

12

B. The Defendants' Motion for Summary Judgment

1. 42 U.S.C. § 1983 (Count One)

Count One alleges unconstitutional excessive force under 42 U.S.C. § 1983. Compl. at 9-10. The Defendants argue that summary judgment should be granted on this claim because "there was no excessive force," and they are entitled to qualified immunity because their actions were "reasonable." ECF No. 9-1 at 10, 19. Bixler contends that, drawing all reasonable inferences in his favor, "it is clear that the [D]efendants employed excessive force under any constitutional analysis." ECF No. 10-1 at 2. Bixler also argues that "the law is clearly established that police officers are not allowed to beat a handcuffed defendant posing no resistance." *Id.*

Section 1983 provides a remedy against any person who, acting under color of law, deprives another of constitutional rights. 42 U.S.C. § 1983. It "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (internal quotation marks and citation omitted). The parties do not dispute that the Defendants' actions, while in uniform and driving police vehicles, were "under color of state law." Harris Decl. ¶ 2; Rasinski Decl. ¶ 2; Tognocchi Decl. ¶ 2; Grove Decl. ¶ 2. The issues, then, are whether a constitutional right was violated, and, if so, whether

the right was clearly established at the time of the incident. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But, "[t]he answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a motion for summary judgment on qualified immunity grounds." *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007) (internal quotation marks omitted).

a. Constitutional Violation

The plaintiff has the burden of proving a constitutional violation. *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993). "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Bixler alleges that the Defendants violated his rights under the Fourth and Fourteenth Amendments. Compl. ¶ 66.

i. Fourth Amendment

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be

14

violated." U.S. Const. amend. IV. The Amendment "governs claims of excessive force *during the course* of an arrest, investigatory stop, or other 'seizure' of a person."[19] A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied."[20] The Fourth Circuit has "rejected any concept of a continuing seizure rule," holding that "'the Fourth Amendment . . . applies to the initial decision to detain an accused, not to the conditions of confinement after that decision has been made.'" *Robles v. Prince George's Cnty., Md.*, 302 F.3d 262, 268 (4th Cir. 2002) (*quoting Riley*, 115 F.3d at 1163). Thus, "[o]nce the single act of detaining an individual has been accomplished, the [Fourth] Amendment ceases to apply." *Id.* Claims about the subsequent use of excessive force are governed by the Fourteenth Amendment's Due Process Clause.[21]

"The point at which Fourth Amendment protections end and Fourteenth Amendment protections begin is often murky." *Orem*, 523 F.3d at 446. The Defendants argue that the Fourth Amendment does not apply to Bixler's § 1983 claim, because Bixler "was secured in the patrol vehicle awaiting transport to a booking

---

[19] *Riley v. Dorton*, 115 F.3d 1159, 1161 (4th Cir. 1997) (en banc) (emphasis added) (*citing Graham*, 490 U.S. at 388), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010).

[20] *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989).

[21] *Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008).

facility when he began to struggle with his handcuffs and use of force was required to re-secure [him]." ECF No. 9-1 at 11. Bixler counters that the Fourth Amendment "extends to the circumstances of the actual arrest, from the initial seizure through at least placement in the police cruiser." ECF No. 10-1 at 9.

Accepting Bixler's evidence as true, and drawing all justifiable inferences in his favor,[22] there can be no question that Bixler had been "seized" for Fourth Amendment purposes before the allegedly assaultive conduct began: Grove handcuffed and detained him pending the MSP officers' arrival, and Harris took custody when he replaced Grove's handcuffs with his own. Bixler Decl. ¶¶ 6, 8; Harris Decl. ¶ 14; Grove Decl. ¶ 5.[23] Bixler does not argue that the Defendants used excessive force in accomplishing either of these initial seizures. See Compl. ¶¶ 22-23, 27-28; Bixler Decl. ¶¶ 6, 8.[24] Instead, he complains

---

[22] See Anderson, 477 U.S. at 255.

[23] See also United States v. Watson, 703 F.3d 684, 689 (4th Cir. 2013) ("A seizure warranting Fourth Amendment protection occurs when in view of the totality of the circumstances, a reasonable person would not feel free to leave or otherwise to terminate an encounter with police."); California v. Hodari D., 499 U.S. 621, 625 (1991) ("A seizure is a single act, and not a continuous fact.").

[24] Bixler's sole allegation about Harris's seizure is that the handcuffs were "very tight" and caused him pain, and Harris appeared to be angry with him. Bixler Decl. ¶ 8. To the extent that this allegation forms the basis for Bixler's § 1983 claim,

that, *after* he was handcuffed and brought to Harris's police car, and *after* he was searched incident to arrest, Harris and other Defendants "viciously" punched him in the face and threw him into a ditch. Bixler Decl. ¶¶ 13-25.[25]  By then, under *Robles*, "the Fourth Amendment had ceased to apply." *Walters v. Prince George's County*, No. AW-08-711, 2010 WL 2858442, at *6 (D. Md. July 19, 2010); see *also Orem*, 523 F.3d at 446 (the Fourth Amendment's protections "do not extend" to arrestees). Summary judgment will be granted on Bixler's Fourth Amendment claim in Count One.

        ii.   Fourteenth Amendment

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  The Amendment's Due Process Clause "includes a substantive component that provides heightened protection against government interference with certain fundamental rights." *Martin v. St. Mary's Dep't of Social Servs.*, 346 F.3d 502, 511 (4th Cir. 2003).  As stated above, arrestees have Due Process protections against excessive force.

---

there is no evidence that Harris acted unreasonably, within the meaning of the Fourth Amendment, in handcuffing Bixler.  *See Graham*, 490 U.S. at 396.

[25] Bixler's opposition to the Defendants' motion similarly argues that the Defendants violated § 1983 by "severely beat[ing]" him "*while [he was] handcuffed.*"  ECF No. 10-1 at 1 (emphasis added).

17

*Orem*, 523 F.3d at 446. To violate due process, a defendant's

actions must "amount[] to punishment." *Robles*, 302 F.3d at 269.

A restriction or condition is "punishment" when it is "not

reasonably related to a legitimate goal." *Bell v. Wolfish*, 441

U.S. 520, 539 (1979).[26] Further, injury that results from the

allegedly unlawful force must be "more than *de minimis.*"[27]

The Defendants insist that summary judgment is appropriate

because "the motivating factor for TFC Harris [in using force

against Bixler] was not to inflict unnecessary punishment.

Instead, his goal was to prevent [Bixler] from harming himself

and [Harris's] fellow trooper." ECF No. 9-1 at 12. Speci-

fically, the Defendants emphasize that Bixler was placed in the

patrol car; while in the car, he attempted to remove his

handcuffs; became stuck in an uncomfortable position; required

the officers' assistance to correct his position; and, when

assistance was rendered, actively resisted their efforts to re-

secure him. Harris Decl. ¶¶ 17-22; Rasinski Decl. ¶¶ 14-16.

However, Bixler's sworn statements tell a materially

different story. According to Bixler, after he was searched and

while he was handcuffed, Harris broke his sunglasses and phone,

---

[26] *See also United States v. Cobb*, 905 F.2d 784, 789 (4th Cir.
1990) ("the punitive intent behind a defendant's use of force
may be inferred when the force is not reasonably related to a
legitimate non-punitive governmental objective").

[27] *Riley*, 115 F.3d at 1167 ("Punishment must mean something more
than trifling injury or negligible force.").

18

ripped his pants, and--with the aid or acquiescence of the other
Defendants--punched Bixler four times in the face before
throwing him in a ditch. Bixler Decl. ¶¶ 15-25. He presents
evidence that he suffered more than *de minimis* injuries. *Id.* ¶¶
27-32. On a motion for summary judgment, the Court is required
to accept Bixler's sworn statements and other evidence as true.
*Anderson*, 477 U.S. at 255. Having done so, the Court finds that
there is a genuine issue of material fact about whether the use
of force was excessive, in violation of Bixler's rights under
the Due Process Clause.[28]

     b. Clearly Established

Because Bixler has established a genuine dispute about the
existence of a constitutional violation, the Defendants bear the
burden of proving their entitlement to qualified immunity.
*Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003). Under this
doctrine, government officials are immune from liability
"insofar as their conduct does not violate clearly established

---

[28] *See also McMillian v. Wake Cnty. Sheriff's Dep't*, 399 F. App'x
824, 828 (4th Cir. 2010) ("Crediting [the plaintiff's] version
of the events, we cannot say, as a matter of law, that knocking
down, punching, and kicking an arrestee while he is in handcuffs
are actions taken in good faith to restore order."); *Stewart v.
Beaufort Co.*, 481 F. Supp. 2d 483, 487, 491 (D.S.C. 2007)
(denying defendant's motion for summary judgment and finding
that a deputy used unnecessary and excessive force when he
slammed a handcuffed and unresisting pretrial detainee into the
side of a door and threw him onto the ground, causing
lacerations and contusions to the pretrial detainee's face,
nose, eyes, lips, shoulder, and back).

statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[G]ranting summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." *Rainey v. Conerly*, 973 F.2d 321, 324 (4th Cir. 1992).[29]

Here, there is a genuine factual dispute about whether, while Bixler was handcuffed, the Defendants repeatedly punched him in the face and threw him to the ground, or allowed other Defendants to do so, in violation of Bixler's clearly established Due Process right to protection against excessive force. *Orem*, 523 F.3d at 448 ("In 2005, it was clearly established that an arrestee or pretrial detainee is protected from the use of excessive force."); *see supra* Part II.B.1(a)(ii); *infra* Part II.B.1(c). These disputes preclude summary judgment on qualified immunity grounds.[30]

---

[29] *See also Anderson v. Creighton*, 483 U.S. 635, 640 (1987). ("[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). "[A]lthough the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest." *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998), *aff'd*, 526 U.S. 603 (1999).

[30] *See Robles*, 302 F.3d at 269 (force that amounts to punishment violates due process); *see also Bailey v. Kennedy*, 349 F.3d 731, 745 (4th Cir. 2003) (affirming denial of qualified immunity on excessive force claim when the plaintiff was unarmed, and the

c. Personal Involvement

The Defendants alternatively argue that summary judgment should be granted as to Tognocchi and Grove, who "had no personal involvement" in the use of force against Bixler. ECF No. 9-1 at 18.[31] Bixler objects that he has "alleged and indeed provided evidence" sufficient to establish a genuine dispute of material fact about whether Tognocchi and Grove were present and participated in the assault. ECF No. 10-1 at 19.

As a general matter, a law enforcement officer may incur § 1983 liability only through affirmative misconduct. *Parratt v. Taylor*, 451 U.S. 527, 535-36 (1981), *overruled on other grounds*

---

officers' use of force continued even after he was secured with flex-cuffs around both his hands and his feet, and lying face down on the floor); *Mayard v. Hopwood*, 105 F.3d 1226, 1227-28 (8th Cir. 1997) (denying qualified immunity to an officer who slapped and punched a suspect, in handcuffs and leg restraints, even though the suspect had, before being restrained, kicked and hit an officer, physically resisted arrest, and shouted and screamed at officers); *Kane v. Hargis*, 987 F.2d 1005, 1006-07 (4th Cir. 1993) (denying qualified immunity on excessive force claim when, taking the facts in the light most favorable to the plaintiff, she resisted arrest for driving under the influence and the police officer, after he had secured her, "repeatedly push[ed] her face into the pavement, cracking three of her teeth, cutting her nose, and bruising her face").

[31] The Defendants' reply argues that summary judgment should also be granted for Rasinski, on the grounds that he similarly did not participate in the alleged beating. *See generally* ECF No. 13 at 2-6. Because the Defendants did not advance this argument in their original motion, *see* ECF No. 9-1 at 18-19, 23, the Court will not consider it here. *See SEC v. Pirate Investor*, 580 F.3d 233, 255 n.23 (4th Cir. 2009) (arguments raised for the first time in a reply brief or memorandum will not be considered).

by *Daniels v. Williams,* 474 U.S. 327 (1986). There are two
exceptions to this general rule: supervisory and bystander
liability. Under the latter theory, an officer may be liable
under § 1983 if he: "(1) knows that a fellow officer is
violating an individual's constitutional rights; (2) has a
reasonable opportunity to prevent the harm; and (3) chooses not
to act." *Randall v. Prince George's Cnty., Md.,* 302 F.3d 188,
204 (4th Cir. 2002) (footnote omitted). "The rationale
underlying the bystander liability theory is that a bystanding
officer, by choosing not to intervene, functionally participates
in the unconstitutional act of his fellow officer." *Id.* at 204
n.24.[32]

The Court will assume, for purposes of this analysis, that
Bixler has failed to show a genuine dispute of material fact
about Tognocchi and Grove's direct involvement in the use of
excessive force against him.[33] Bixler has also alleged, however,

[32] Although the complaint includes a passing reference to
supervision, *see* Compl. ¶ 66, it is devoid of any factual
allegations that any Defendant supervised any other Defendant,
let alone that a supervising Defendant was "on notice" of his
subordinate's tendency to act outside the law. *See Shaw v.
Stroud,* 13 F.3d 791, 798 (4th Cir. 1994). Because the complaint
did not adequately present a claim of supervisory liability, the
Court will not consider it here. *See Williams v. Maryland,* No.
DKC 09-0879, 2011 WL 3422825, at *4 (D. Md. Aug. 3, 2011).

[33] *See, e.g., Fernandes v. Montgomery Cnty., Md.,* No. AW-10-cv-
752, 2012 WL 1664086, at *3 (D. Md. May 10, 2012) ("The Court
cannot impute liability on [a § 1983 defendant] when Plaintiff
simply speculates that [the officer] is one of the individuals

that Tognocchi and Grove were bystanders to Harris and Rasinski's unlawful conduct. *See* Compl. ¶ 66 (stating that the Defendants have a duty to, *inter alia*, prevent the use of excessive force by a fellow officer, and alleging that, "after having a reasonable opportunity to intervene in the use of excessive force," they knowingly failed to do so). Bixler has stated, under oath, that Grove was present during the alleged beating. Bixler Decl. ¶ 24. *But see* Grove Decl. ¶ 6. Tognocchi says that he was "about" one-tenth of a mile away from the scene of arrest. Tognocchi Decl. ¶ 15. Finally, the MSP Criminal Investigation Report lists Tognocchi and Grove as "witnesses" to Bixler's resisting arrest. ECF No. 10-3 at 2. This evidence is sufficient to create a genuine issue for trial: namely, whether Tognocchi and Grove knew that Harris and/or Rasinski was violating Bixler's constitutional rights and, although having the opportunity to intervene on Bixler's behalf, chose not to. *See Randall*, 302 F.3d at 204.

Thus, summary judgment will be denied on Bixler's Fourteenth Amendment claim in Count One.[34]

---

who kicked and punched him."). *But see Howie v. Prince George's Cnty.*, No. DKC 2006-3465, 2009 WL 2426018, at *3-4 (D. Md. Aug. 5, 2009) (denying summary judgment despite plaintiff's inability to identify which of the Defendants used force in effecting his arrest).

[34] Bixler has submitted, although the Court--having determined that summary judgment cannot be granted on Bixler's Fourteenth

2. Maryland Tort Claims (Counts Two and Three)

a. Assault

Count Two alleges assault, in violation of Maryland law.
Compl. at 10. The Defendants argue that summary judgment should
be granted on this claim because it is untimely. ECF No. 9-1 at
21-22. Bixler "[does not] challeng[e] the dismissal of his
assault claim[] on limitations grounds." ECF No. 10-1 at 20
n.7. Under Maryland law, a claim for assault must be filed
"within one year from the date it accrues." Md. Code Ann., Cts.
& Jud. Proc. § 5-105. "[A] cause of action accrues when a
plaintiff in fact knows or reasonably should know of the wrong."
*Hecht v. Resolution Trust Corp.*, 635 A.2d 394, 399 (Md. 1994).
In his complaint, Bixler alleges that he was assaulted on June
13, 2009. Compl. ¶ 14. Bixler filed suit almost three years
later, on June 5, 2012. *See* docket. Summary judgment will be
granted on Bixler's assault claim.

b. Battery

Count Three alleges battery, in violation of Maryland law.
Compl. at 10-11. The Defendants argue that Bixler's battery
claim fails because the use of force was legally justified. ECF

---

Amendment claim in Count One--need not consider, additional
grounds for denying summary judgment: a Rule 56(d) affidavit.
*See* ECF No. 10-4. In his affidavit, counsel notes the fact-
sensitive nature of this case, and specifically requests the
opportunity to take discovery on each defendant's role in
Bixler's arrest, "absent which [Bixler] cannot effectively
oppose movants' one-sided presentation." *Id.* ¶¶ 4-5.

No. 9-1 at 22-23. The Defendants further argue that they are entitled to statutory immunity. *Id.* at 24-26. Finally, the Defendants argue, as with respect to the § 1983 claim, that summary judgment is appropriate on the battery claim against Tognocchi and Grove because neither was present during "any use of force" against Bixler. *Id.* at 22-23.

      i.    Battery: Legally Justified?

In Maryland, battery is defined as "an offensive, non-consensual touching--the unlawful application of force to the person of another." *Katsenelenbogen v. Katsenelenbogen*, 775 A.2d 1249, 1255 n.1 (Md. 2001) (internal quotation marks omitted). "False imprisonment, false arrest, and assault and battery (*when the force used is not excessive*) can only occur when there is no legal authority or justification for the arresting officer's actions." *Williams v. Prince George's Cnty.*, 685 A.2d 884, 898 (Md. Ct. Spec. App. 1996) (emphasis added), *quoted in Hines v. French*, 852 A.2d 1047, 1055 (Md. Ct. Spec. App. 2004). "[T]he privilege that a law enforcement officer possesses to commit a battery in the course of a legally justified arrest extends only to the use of reasonable force, not excessive force. To the extent that the officer uses excessive force in effectuating an arrest, the privilege is lost." *French v. Hines*, 957 A.2d 1000, 1037 (Md. Ct. Spec. App. 2008).

25

The Defendants principally argue that summary judgment is warranted because Bixler's arrest was "legally justified." ECF No. 9-1 at 22. Specifically, the Defendants note that there was probable cause to believe Bixler had "fled and attempted to elude the troopers"--an arrestable offense under Maryland law. *Id.* (*quoting* Md. Code Ann., Transp. § 26-202(a)(3)(vii)). However, that Bixler's arrest may have been legally justified does not resolve the genuine dispute about whether the force employed against Bixler was excessive. *Cf. French*, 957 A.2d at 1037. Thus, the Defendants are not entitled to summary judgment on the grounds that Bixler's arrest was legally justified.

ii. Statutory Immunity

The Maryland Tort Claims Act (the "MTCA")[35] grants statutory immunity to "Maryland state personnel who commit a 'tortious act or omission . . . within the scope of the[ir] public duties,' provided the act or omission 'is made without malice or gross negligence.'" *Henry v. Purnell*, 619 F.3d 323, 342 (4th Cir. 2010) (alterations in original) (*quoting Okwa v. Harper*, 757 A.2d 118, 128 (Md. 2000)). A state employee acts with "malice" when he or she performs an act "without legal justification or excuse," to "deliberately and wil[l]fully injure the plaintiff." *Shoemaker v. Smith*, 725 A.2d 549, 560 (Md. 1999) (internal quotation marks omitted). Malice is "seldom admitted" and must

---

[35] Md. Code. Ann., State Gov't §§ 12-101, *et seq.*

"often[] [be] inferred from acts and circumstantial evidence."
*Newell v. Runnels*, 967 A.2d 729, 763 (Md. 2009) (internal
quotation marks omitted). To survive summary judgment, "the
plaintiff must point to specific evidence that raises an
inference that the defendant's actions were improperly
motivated." *Ford v. Balt. City Sheriff's Office*, 814 A.2d 127,
137 (Md. Ct. Spec. App. 2002) (internal quotation marks
omitted). Malice may be found even if the state employee's
actions were "objectively reasonable." *Sykes v. Wicomico Cnty.*,
No. CCB-05-2846, 2007 WL 1073607, at *8 (D. Md. Mar. 30, 2007).

The Defendants argue that Harris and Rasinski "did nothing
to indicate an ill will, evil intent or wanton and reckless
disregard for human life towards [Bixler]; rather[,] they were
attempting to restrain him and safely secure him for transport
to a booking facility." ECF No. 9-1 at 25-26. Again, the
Defendants ignore Bixler's sworn statements that, while he was
handcuffed, Harris broke his sunglasses and cell phone, and
ripped his pants. Bixler Decl. ¶¶ 15, 18. These actions--
considered in conjunction with the alleged beating that
immediately followed--are sufficient to raise an inference of
improper motivation. *Shoemaker*, 725 A.2d at 560.[36]

---

[36] Because there is a genuine dispute of material fact about
whether the excessive force was malicious under the MTCA, the
Court need not consider whether it was grossly negligent.

### iii. Personal Involvement

The Defendants argue that summary judgment is appropriate as to Tognocchi and Grove because "the [officers'] declarations clearly set forth that neither . . . [was] on scene" when the force was employed. ECF No. 9-1 at 23. Bixler objects that he has "alleged and indeed provided evidence sufficient to establish a dispute of material fact that Tognocchi and Grove were present and may have participated in his beating." ECF No. 10-1 at 19.

The Court will assume, without deciding, that there is insufficient evidence of Tognocchi and Grove's direct participation in the battery. Bixler has also alleged that these Defendants are liable to the extent that they aided and abetted Harris and Rasinski's actions. Compl. ¶ 72; *see Alleco Inc. v. Weinberg Found., Inc.*, 665 A.2d 1038, 1049 (Md. 1995) (one may be held civilly liable in tort as an aider and abettor to a tort committed by another); *Saadeh v. Saadeh, Inc.*, 819 A.2d 1158, 1171 (Md. Ct. Spec. App. 2003) ("To be liable in tort, the aider or abettor must have engaged in assistive conduct that he would know would contribute to the happening of that act."). For the reasons stated in Part II.B.1(c),[37] there is a genuine dispute of material fact about whether Tognocchi

---

[37] Finding a genuine dispute of material fact about Tognocchi and Grove's § 1983 bystander liability.

and Grove were present during the battery and the extent to which they acted to facilitate it.

Summary judgment will be denied on Bixler's battery claim.

3. Maryland Constitutional Claims (Counts Four and Five)

Counts Four and Five allege violations of Articles 24 and 26 of the Maryland Declaration of Rights, which "prohibit employment of excessive force during a seizure." *Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011). "The standards for analyzing claims under these articles are the same as for analyzing Fourth Amendment claims." *Id.* (*citing Randall v. Peaco*, 927 A.2d 83, 89 (2007)); *see also Smith v. Bortner*, 998 A.2d 369, 375 (Md. Ct. Spec. App. 2010) ("Maryland cases have said that the standard for analyzing claims of excessive force by police officers are the same under Articles 24 and 26 of the Maryland Declaration of Rights and that the test is one of objective reasonableness . . .").[38]

The determination of whether an officer's use of force is reasonable requires "careful" attention to the facts and

---

[38] Critically, the Defendants' entitlement to summary judgment on Bixler's § 1983 Fourth Amendment claim does not affect the viability of Bixler's state constitutional claims. This is because, unlike the Fourth Circuit, Maryland courts have not yet addressed the "continuing violation theory." *See Smith*, 998 A.2d at 377 ("There appears to be no Maryland case adopting or rejecting the 'continuing seizure' rationale for an Article 26 or a Fourth Amendment excessive force claim."). Thus, the Court will consider whether summary judgment is warranted on the merits of Bixler's state constitutional claims.

circumstances of each case, including the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. Reasonableness is determined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott v. Leavitt,* 99 F.3d 640, 642 (4th Cir. 1996).

Although the Fourth Amendment analysis differs somewhat from analysis under the Fourteenth Amendment's Due Process Clause, the outcome here will be the same. Drawing all reasonable inferences in Bixler's favor, there is a genuine dispute of material fact about whether the Defendants' use of force against Bixler was reasonable. *Anderson*, 477 U.S. at 255. Specifically, under the Defendants' version of events, minimal force was applied to Bixler, while he was unsecured, to ensure the safety and well-being of the surrounding officers. Harris Decl. ¶¶ 17-22; Rasinski Decl. ¶¶ 14-16. Under Bixler's version of events, he was brutally beaten while handcuffed and posing no threat. Bixler Decl. ¶¶ 15-25.

Summary judgment will be denied on Bixler's state constitu-

tional claims.

III. Conclusion

For the reasons stated above, the Defendants' motion, construed as a motion for summary judgment, will be granted in part and denied in part.

_____5/31/13_____

Date

William D. Quarles, Jr.
United States District Judge